IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROCHEAL LEWIS,

              **Plaintiff,**

    **v.**                                **1:15-cv-1483-WSD**

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

              **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Catherine M. Salinas's Final Report and Recommendation [13] ("R&R"). The R&R recommends the Court reverse and remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff Rochael Lewis's ("Plaintiff") application for supplemental security income ("SSI"). Also before the Court are the Commissioner's Objections to the R&R [17].

## I.   BACKGROUND

On October 21, 2013, Plaintiff filed an SSI application, alleging that she became disabled on November 1, 2008. (Social Security Tr. [8] ("Tr.") 227-35). The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration. (Tr. 127, 144). On September 15, 2014, Plaintiff appeared

at a hearing before an Administrative Law Judge ("ALJ").  (Tr. 38-73).  On

December 19, 2014, the ALJ issued a decision denying Plaintiff's SSI claim.  (Tr.

12-27).  Plaintiff requested review of the decision by the Appeals Council ("AC").

On March 3, 2015, the AC denied review, making the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-6).

    A.    <u>Facts</u>[1]

        1.    <u>Plaintiff's Medical and Work History</u>

Plaintiff was 58 years old at the time of the ALJ's decision.  (Tr. 25, 27,

227).  Plaintiff has a twelfth-grade education, (Tr. 267), and past work experience

as a companion.  (Tr. 44, 70).  Plaintiff alleges disability due to depression, panic

attacks, and post traumatic stress disorder ("PTSD").  (Tr. 266).  Plaintiff claims

that she stopped working in November 2008 "because of [her] condition(s)."  (<u>Id.</u>).

Plaintiff has a sporadic, intermittent work record, a long history of

homelessness and mental health issues, and a history of drug and alcohol abuse, in

sustained remission.  Her persistent symptoms have included anxiety, irritability,

mood swings, depression, sleep problems, chest pain, panic attacks, shortness of

---

[1]    The facts are taken from the R&R and the record.  The parties have not
objected to any specific facts in the R&R, and the Court finds no plain error in
them.  The Court thus adopts the facts set out in the R&R.  <u>See</u> <u>Garvey v. Vaughn</u>,
993 F.2d 776, 779 n.9 (11th Cir. 1993).

breath, a productive cough, old rib fractures, and PTSD.  During clinical interviews and mental status exams, she has reported a history of sexual abuse by her stepfather, a family history of alcohol dependence and mental health issues, physical abuse by her mother, domestic abuse by her husband (from whom she is separated), and she reported being raped in 2000 by a stranger wielding a gun and a machete.  (Tr. 757, 764).  Plaintiff's diagnoses have included major depressive disorder (mild to moderate); PTSD; anxiety disorder, not otherwise specified ("NOS"); panic disorder without agoraphobia; alcohol dependence in full sustained remission; cocaine abuse; flat feet; and personality disorder, NOS.  (Tr. 93, 318, 343, 435, 444, 766).

In September 2012, Plaintiff was treated at the Center for Families and Children in Cleveland, Ohio.  (Tr. 104).  Plaintiff reported an increase in mood swings and irritability, and that insomnia was still a problem.  (Tr. 102).  She also complained of nightmares, feeling anxious, flashbacks, depression, crying spells, panic attacks, chest pains, and not wanting to get dressed.  (Tr. 104).  The psychological evaluation section of the medical records from September 2012 indicates that Plaintiff met the criteria for diagnoses of PTSD, major depressive disorder, and panic attacks (panic disorder without agoraphobia).  (Tr. 108-109). During her clinical interview, Plaintiff reported that she was unemployed, and was

interested in working, but stated that she was "[t]rying to get SSI so does not want to work to interfere with this."  (Tr. 107).  She reported that she was raped by a stranger she met at a club when she was in her late twenties, but "was paid for it." (Tr. 104).  She also reported having served in the military and that she was currently receiving VA benefits.  (Tr. 107).

She returned for follow-up visits in October and November 2012, with complaints of an increase in her mood swings, irritability and insomnia.  She reported being compliant with the medication she had been prescribed (Celexa), but stated that it did not seem to be helping as much as before.  (Tr. 100-102).  She also complained of feeling "overwhelmed" and "like sometimes she can't go on." (Tr. 102).

At her administrative hearing, Plaintiff testified that she was discharged from the military during basic training because of her feet.  She denied receiving VA benefits, and testified that the military has apparently lost all record of her service and the honorable discharge that she claims she was granted.  (Tr. 46-48). Plaintiff testified that she had not used cocaine since 2009.  (Tr. 51).  On January 20, 2013, Plaintiff sought treatment at the emergency department of Grady Hospital with complaints of a persistent productive cough and a history of bronchitis.  (Tr. 625).  She reported that she had used cocaine the previous

4

evening, and her last use prior to that time was two months before that.  (Tr. 631).

She was admitted to the hospital for three days for evaluation and sputum tests,

given a recent positive tuberculosis skin test that she received while staying at the

Gateway homeless shelter.  Active TB was ruled out, but Plaintiff was referred to

the county health department for treatment of latent TB.  (Tr. 628-29).

In February 2013, Plaintiff was seen again at Grady for continued coughing

and shortness of breath.  She reported a forty-year history of cigarette use, smoking

one to three packs of cigarettes per day.  (Tr. 725).  She was treated for bronchitis

and discharged with a prescription for Azithromycin, an antibiotic.  (Tr. 728).

In connection with Plaintiff's SSI application, the SSA directed Plaintiff to

undergo two consultative psychological evaluations.  The first evaluation was

conducted on April 16, 2013, by Anne B. Moore, Psy.D.  (Tr. 89).  The evaluation

included a clinical interview, a mental status examination, intellectual and

performance testing, and a review of prior records.  Plaintiff's complaints included

depression, anxiety, PTSD, and flat feet.  (Id.).  During the interview portion of the

evaluation, Plaintiff reported chronically poor stress tolerance and difficulty

maintaining employment because "she was unable to calm down."  (Id.).  In

Dr. Moore's written report, under "Social History," Dr. Moore noted Plaintiff's

reports of physical and sexual abuse by her mother and stepfather, and physical

abuse by her husband.  (Tr. 89- 90).  Under "Work History," Plaintiff reported that she had served in the Army for three years doing administrative tasks and was honorably discharged in 1977.  (Tr. 90).  She reported working on an assembly line at GenAir in the 1970s, but stated that she had to leave that job after she tried to flush a coworker's head down the toilet.  (Id.).  Plaintiff told Dr. Moore that after the Army, she worked at a series of entry level jobs, mostly in the fast food industry. Plaintiff reported that, in 2010, she left her employment with Subway after complaining that she was doing more work than others.  She did not have any formal income after leaving Subway, but reported receiving $200 per month in food stamps.

Regarding her past mental health history, Plaintiff told Dr. Moore that she first had depressive, anxious symptoms as a teenager and overdosed twice at ages 16 and 18.  Her depression was exacerbated by her high intake of alcohol in her twenties and thirties.  She denied psychiatric hospitalizations, but reported that she received mental health outpatient services as part of a research study in 2010 and in 2012 at the Center for Families & Children in Cleveland, Ohio.  (Tr. 90-91).

Plaintiff reported that her daily activities included eating breakfast, watching game shows, doing small chores, reading her Bible, and resting.  She often skipped showering for several days, especially if she was not leaving the

6

house.  She reported that she was able to shop for groceries, but sometimes lacked the energy to prepare meals, so the food would go bad.  She completed chores every couple of days.  At some point Plaintiff had taken up knitting, but she reported that she no longer knitted.  She reported historically having poor social relationships.  She said that her sole current contact was a friend she lives with.

Tests showed Plaintiff's full scale IQ score was 72.  Plaintiff's concentration was average to poor.  Her remote memory was average, and her recent memory was mildly to moderately compromised.  She did not have any reported or observed psychotic symptoms.  Her insight and judgment were average to poor. She was fully oriented, and her thought process was logical and goal directed.  (Tr. 91).  Plaintiff was able to understand and recall all instructions and complete all subtests.  Her attention, concentration, and effort appeared adequate.  Dr. Moore noted that all of Plaintiff's clinical information had internal consistency. Dr. Moore further noted that Plaintiff's depressive mood and low stress tolerance were evidenced by her inconsistent work history, decreased productivity, and frustrated behaviors during her interview and testing.  (Tr. 92).

Under "Occupational Conclusions," Dr. Moore opined that Plaintiff's ability to understand and remember simple and detailed instructions was mildly to moderately compromised.  Her ability to interact with coworkers, supervisors and

the public was moderately to markedly compromised, based on Plaintiff's reported attempt to put a coworker's head in a toilet in the 1970s, her report that she accused others of doing less than herself, and her report that she has only one friend and mostly remains preoccupied and alone.  (Tr. 93).  Dr. Moore rated Plaintiff's ability to sustain attention and remain productive as moderately compromised.  Dr. Moore supported her opinion by noting that Plaintiff "procrastinates doing tasks such as cooking and no longer attempts knitting."  (Id.). Dr. Moore rated Plaintiff's ability to adapt to normal work stressors as markedly compromised, and noted that Plaintiff historically coped by drinking, but she now "disengages and withdraws."  (Id.).  Dr. Moore's diagnostic impressions were: (Axis I) major depressive disorder, recurrent moderate; PTSD, chronic, alcohol dependence in full sustained remission; and (Axis II) personality disorder NOS. (Id.).  Dr. Moore opined that Plaintiff's Axis I conditions were treatable, but her prognosis was "marginal" due to Plaintiff's chronic issues and uncertain access to services.  (Id.).

On February 17, 2014, Plaintiff underwent a second consultative evaluation. The examination was conducted by Ifetayo Ojelade, Ph.D., and included a clinical interview with Plaintiff, a collateral interview with Plaintiff's "significant other," Lakesha Williams, a review of supplied case records, and a mental status

8

examination.  (Tr. 763).  Dr. Ojelade noted Plaintiff's complaints of depression, panic attacks, PTSD, GERD, and old rib fractures.  Plaintiff reported to Dr. Ojelade that she was currently unemployed, and her last employment was in 1994 as a home healthcare aide.  (Tr. 764).  She denied any history of hospitalizations or ongoing mental health treatment, except for an outpatient research study in 2010. She denied currently taking any medication.  Her supplied records noted previous diagnoses of major depressive disorder, panic disorder, and PTSD.  (Id.).

Plaintiff described her current symptoms as including anxiety, irritability, persistent mood swings, insomnia, varying energy levels, and periodic crying spells.  She reported being molested by her stepfather and raped in 2000 by a stranger at gun point wielding a machete.  She reported a history of angry outbursts and a tendency to withdraw socially, persistent hypervigilance, and flashbacks. Plaintiff's companion confirmed Plaintiff's symptoms, and noted that Plaintiff often refuses to bathe.  (Id.).

Plaintiff reported that her daily living activities included waking up, managing her daily hygiene, going to appointments, and eating out.  Plaintiff reported being able to independently bathe, talk on the telephone, drive, ride in a car, take the bus, walk short and long distances, manage her own money, pay bills,

feed herself, and go to bed and the bathroom on time.  Plaintiff admitted that she

lacked motivation for managing her personal hygiene, combing her hair, and

putting on attractive clothing.  (Tr. 765).  Dr. Ojelade observed that Plaintiff's

hygiene was "extremely poor," and she smelled "of smoke and limited recent

bathing experiences."  (Id.).  Her motor behavior during the mental status

examination was marked by constant movements.  She was talkative, with good

eye contact and sad mood.  Her demeanor was cooperative, and her thought

processes were tangential.  Her attention and concentration skills were normal, and

she could follow commands.  Dr. Ojelade opined that Plaintiff's ability to

concentrate during the session was inconsistent with her reported abilities related

to depressive symptoms.  (Tr. 766).  Dr. Ojelade opined that Plaintiff's overall

cognitive abilities appeared to be within the low/high average range, as evidenced

by her ability to complete paperwork independently, follow his instructions, and

provide appropriate responses during the interview.  Dr. Ojelade found little

evidence that Plaintiff exaggerated or magnified her symptoms during the

interview.  (Id.).

After reviewing Plaintiff's supplied medical records and considering her

clinical presentation, Dr. Ojelade opined that Plaintiff appeared to be experiencing

mild to moderate symptoms associated with PTSD, depression, and trauma-related

stressors associated with a complex history of sexual and physical abuse.  His DSM-5 diagnostic impressions were major depressive disorder, mild, and PTSD. (Tr. 766).

Dr. Ojelade opined that Plaintiff demonstrated an ability to understand and remember simple and detailed instructions, and her responses during the interview suggested that she has the ability to sustain attention over time.  However, he stated that her prognosis was "poor unless trauma-related mental health treatment is sought."  (Tr. 767).  Dr. Ojelade opined that, "[o]verall, she appears to be incapable to adapt to stressors that can result from the demands of being in a work environment and daily functioning.  To her strength, she is able to maintain positive social interactions," and "appears to be capable of handling her own finances."  (Id.).

In February and March 2014, non-examining state agency medical consultants reviewed Plaintiff's evidence of record, including the psychological evaluations by Drs. Moore and Ojelade, and concluded that Plaintiff's mental health impairments produced moderate functional limitations across her activities of daily living, social functioning, and concentration, persistence, or pace.  (Tr. 111-126, 128-143).  The consultants concluded that Plaintiff is capable of performing simple work tasks, that she would work best in a low-stress and

relatively isolated work environment, and that contact with the public should be limited.  (Tr. 122-23, 136-40).

Between February 2013 and May 2014, Plaintiff did not receive any medical treatment until she returned to Grady Hospital's emergency room on May 3, 2014, complaining of a cough and upper respiratory infection.  (Tr. 828).  The hospital staff took her vital signs, examined her, and discharged her later that night.  (Tr. 828-37).

### 2.   ALJ's Decision

After reviewing the entire record and the testimony at the administrative hearing, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 21, 2013, the date of Plaintiff's SSI application.  (Tr. 14, Finding No. 1).  The ALJ found that Plaintiff had the following severe impairments: depressive disorder; history of post-traumatic stress disorder; history of cocaine abuse; and remote history of alcohol abuse.  (Id., Finding No. 2).  The ALJ concluded that Plaintiff's history of polysubstance abuse disorders did not impact Plaintiff's ability to perform the basic work activities delineated in the residual functional capacity ("RFC") set forth in his decision, and therefore, Plaintiff's past drug and alcohol use were not material to the ALJ's decision.  (Id.).

In Finding No. 3, the ALJ concluded that Plaintiff did not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), including Listings 12.04, 12.06, and 12.09.  (Tr. 15). The ALJ found that Plaintiff had moderate difficulties with daily living, social functioning, and concentration, persistence, or pace.  (Tr. 15).  He found that she had not experienced any episodes of decompensation of extended duration. Because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked limitation" and "repeated" episodes of decompensation, each of extended duration, the ALJ determined that the "paragraph B" criteria were not satisfied.  (Tr. 16).  The ALJ determined that the evidence failed to establish the presence of "paragraph C" criteria.  (Id.).

The ALJ found that Plaintiff provided inconsistent testimony regarding portions of her work history, participation in a research study, and past drug use, and found Plaintiff not fully credible.  (Tr. 20, 21, 22).  The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:  Plaintiff is unable to climb ropes, ladders, or scaffolds.  She cannot have concentrated exposures to hazards.  She is able to perform simple work tasks of skill levels one and two.  She can perform work in low stress jobs, which are those jobs that require few changes in the

13

workplace, occasional, simple decision-making, and no work on high-speed assembly lines.  Plaintiff can have occasional, superficial contacts with the general public and coworkers.  (Tr. 16, Finding No. 4).

At step four, the ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 25, Finding No. 5).  At step five, based on vocational expert testimony and the Medical-Vocational Guidelines and the DOT, the ALJ found there were a significant number of other jobs in the national economy that Plaintiff could perform.  (Tr. 26, Finding No. 9).  The ALJ thus found, pursuant to 20 C.F.R. § 416.920(g), that Plaintiff was not disabled from the date Plaintiff filed her application through the date of the decision.  (Tr. 26-27, Finding No. 10).

### 3.   R&R and Objections

On June 6, 2016, the Magistrate Judge issued her R&R.  In it, she determined that the ALJ's basis for discounting portions of Dr. Moore's opinion was erroneous.  The Magistrate Judge found that the ALJ's RFC determination was not supported by substantial evidence.  She recommended the decision of the Commissioner be reversed and remanded.

On June 20, 2016, the Commissioner filed her Objections to the R&R.[2]  The Commissioner argues the Magistrate Judge erred:  (1) by failing to cite to agency regulations applicable to an ALJ's assessment of consultative examiner medical opinions; (2) by finding that the ALJ misrepresented the bases for Dr. Moore's opinion; (3) in finding the ALJ erred in his consideration of Dr. Moore's opinions; (4) in finding the ALJ improperly gave more weight to the non-examining state agency consultant opinions than to Drs. Moore and Ojelade; and (5) in determining that an ALJ's burden at step five must be supported by an RFC assessment of a treating or examining physician.

## II.   LEGAL STANDARDS

### A.   Review of a Magistrate Judge's Report and Recommendation

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a de novo determination of those portions of the report or specified

---

[2]     On July 7, 2016, the Commissioner filed her Substitute Objections to the R&R [17], in which she removes a "misstatement of law" contained in a paragraph on pages 7-8 in the original Objections.  In this Opinion and Order, the Court refers to the Substitute Objections.

proposed findings or recommendations to which objection is made."  28 U.S.C.

§ 636(b)(1).  If no party has objected to the report and recommendation, a court

conducts only a plain error review of the record.  United States v. Slay, 714 F.2d

1093, 1095 (11th Cir. 1983) (per curiam).  Because the Commissioner has objected

to the R&R, the Court conducts its *de novo* review of those portions of the R&R to

which objection is made.  See 28 U.S.C. § 636(b)(1).

B.      Review of a Decision of the Commissioner of Social Security

A court must "review the Commissioner's decision to determine if it is

supported by substantial evidence and based upon proper legal standards."  Lewis

v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more

than a scintilla and is such relevant evidence as a reasonable person would accept

as adequate to support a conclusion."  Id. at 1440.  "We may not decide the facts

anew, reweigh the evidence, or substitute our judgment for that of the

[Commissioner]."  Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004).

C.      Standard for Determining Disability

An individual is considered to be disabled if she is unable "to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months[.]"  42

16

U.S.C. § 423(d)(1)(A).  The impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2)-(3).

"The burden is primarily on the claimant to prove that [s]he is disabled, and therefore entitled to receive Social Security disability benefits."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  To determine if an applicant suffers a disability under the Social Security Act, an ALJ performs a five-step evaluation.  See id.; 20 C.F.R. §§ 404.1520, 416.920.  The five steps are:  (1) the claimant must prove that she is not engaged in substantial gainful activity; (2) the claimant must prove that she is suffering from a severe impairment or combination of impairments; (3) the Commissioner will determine if the claimant has shown that her impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listed Impairment"); (4) if the claimant cannot prove the existence of a listed impairment, she must prove that her impairment

prevents her from performing her past relevant work; (5) the Commissioner must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides her past relevant work.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  If, at any step of the sequence, the claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

## III.    ANALYSIS

The Commissioner argues the Magistrate Judge erred:  (1) by failing to cite to agency regulations applicable to an ALJ's assessment of consultative examiner medical opinions; (2) by finding that the ALJ misrepresented the bases for Dr. Moore's opinion; (3) in finding the ALJ erred in his consideration of Dr. Moore's opinions; (4) in finding the ALJ improperly gave more weight to the non-examining state agency consultant opinions than to Drs. Moore and Ojelade; and (5) in determining that an ALJ's burden at step five must be supported by an RFC assessment of a treating or examining physician.  The Court addresses these arguments in turn.

### A.    Citations to Agency Regulations

The Commissioner first argues the Magistrate Judge erred by failing to cite to agency regulations applicable to an ALJ's assessment of consultative examiner medical opinions, "even though the Commissioner extensively discussed in her brief the regulations . . . which explain factors relevant to the evaluation of medical source opinions." (Obj. at 2). The Court finds this argument unpersuasive. First, the Magistrate Judge relied on SSR 85-15 to support that the ALJ's failure to properly assess Dr. Moore's and Dr. Ojelade's opinions resulted in harmful error. (See R&R at 25). Second, the Commissioner does not provide any authority that requires a federal judge to rely on the SSA's regulations or to address every argument in the Commissioner's briefing in determining whether substantial evidence supports the Commissioner's findings. The Commissioner's first objection is overruled.

### B.    ALJ's Discounting of Dr. Moore's Opinions

The Commissioner next argues the Magistrate Judge erred in finding that the ALJ misrepresented the bases for Dr. Moore's opinions. On April 16, 2013, Dr. Moore evaluated Plaintiff. The evaluation included a clinical interview, a mental status examination, intellectual and performance testing, and a review of prior records. Dr. Moore found that Plaintiff's concentration was average to poor,

and her recent memory was mildly to moderately compromised.  Under the portion of her evaluation titled "Brief Clinical Summary and Occupational Conclusions," Dr. Moore opined that Plaintiff's ability to understand and remember simple and detailed instructions was "[m]ildly to moderately compromised," and her ability to sustain attention and to remain productive was "[m]oderately compromised."  (Tr. 760).  The ALJ gave these opinions "some weight" because they were "generally supported in the long-term record," as demonstrated by Plaintiff's ability to attend to self-care, make medical appointments, shop, help her friend, manage money, and take public transportation despite Plaintiff's lack of comprehensive mental health treatment.  (Tr. 22).

Dr. Moore also opined that Plaintiff's ability to interact with others (coworkers, supervisors, and the public) was "[m]oderately to markedly compromised," Plaintiff's ability to adapt to normal work stressors was "[m]arkedly compromised," and her prognosis was "[m]arginal."  (Tr. 760).  As to these opinions, the ALJ stated:

> The undersigned has given this portion of Dr. Moore's opinions no weight, **for Dr. Moore wrote that she largely relied on the claimant's own statements in coming to these conclusions**.  The claimant has demonstrated a propensity to embellish her symptoms across the record to support her disability claim.  In addition, she was dishonest during the hearing.  Thus, Dr. Moore relied on exaggerated statements in drawing these conclusions.

20

(Tr. 22-23) (emphasis added).

The Magistrate Judge noted that "nowhere in Dr. Moore's report does she state that she 'largely relied on [Plaintiff's] own statements in coming to [her] conclusions.'" (R&R at 19). The Commissioner, relying on a specific portion of Dr. Moore's opinion, argued that Dr. Moore's discredited opinions were, in fact, based on Plaintiff's own statements. The Magistrate Judge found this argument "does not address the fact that the ALJ credited some of Dr. Moore's occupational conclusions, but not others. The ALJ's decision provides no explanation; given the ALJ's reasoning, it is not clear why the ALJ did not reject all of Dr. Moore's opinions." (R&R at 19-20).

In her Objections, the Commissioner again argues that Dr. Moore's opinions were based on Plaintiff's own statements, rather than "test results or mental status exam findings," and thus the ALJ's stated basis for discounting Dr. Moore's opinions was valid. (Obj. at 4). In support of this argument, the Commissioner relies on the section of Dr. Moore's evaluation titled "Diagnostic Justification," which provides:

> Claimant has moderate to severe internalized distress related to her childhood abuse and domestic violence. She has intrusive thoughts of her multiple victimizations at least three times weekly and once she thinks about it she cannot calm down the remainder of the day. She is confused about why she remains so angry. She feels tense around men and has always been uncomfortable with sexual intercourse. Ms.

21

> Lewis states she has avoided intimate relationships and does not want
> to marry again.  Her depressive symptoms include frustrated mood,
> weekly crying spells, neglected hygiene, anhedonia (knitting), and
> hopeless outlook.  She denies SI/HI.  Stressors include adapting to her
> geographic location.

(Tr. 758).

A review Dr. Moore's opinion, including the portion relied on by the

Commissioner, shows that much of Dr. Moore's opinion was, in fact, based on

Plaintiff's own statements.  In stating that Dr. Moore "wrote that she largely relied

on the claimant's own statements" in coming to her conclusions, (Tr. 22-23), it is

possible—if not likely—that the ALJ merely meant that Dr. Moore's opinion

largely relied on Plaintiff's own statements, whether or not Dr. Moore actually

"wrote" that it did.  However, regardless whether the opinion relied on Plaintiff's

own statements, the Court agrees with the Magistrate Judge that the ALJ's stated

reason for discounting portions of Dr. Moore's opinion "does not address the fact

that the ALJ credited some of Dr. Moore's occupational conclusions, but not

others."  (R&R at 19-20).  That Dr. Moore largely relied on Plaintiff's own

statements supports that her other occupational conclusions should be discredited,

and thus "it is not clear why the ALJ did not reject all of Dr. Moore's opinions."

(Id. at 19-20).[3]  The Court, on its *de novo* review, finds the ALJ—in an otherwise thorough and well-reasoned opinion—simply did not adequately explain his reasons for rejecting portions of Dr. Moore's opinions while accepting others.  On remand, the ALJ is instructed to state with specificity his reasons for rejecting or accepting Dr. Moore's opinions, to clarify his statement that Dr. Moore "wrote" that she largely relied on Plaintiff's statements, and, if necessary, to further develop the record regarding the extent of Plaintiff's mental impairment(s), if any, and their effects on her ability to do basic work activities.

### C.    ALJ's Consideration of Dr. Moore's Opinions

The Commissioner next objects to the "factors" the Magistrate Judge applied when she found the ALJ erred in his consideration of Dr. Moore's opinions.  The Court first notes the Commissioner's arguments on this point are difficult to follow.  The crux of the Commissioner's argument appears to be that the ALJ appropriately weighed the opinion of Dr. Moore and the consultative experts, and

---

[3]     In crediting some of Dr. Moore's opinions, the ALJ noted the opinions were "generally supported by the long-term record . . . ."  (Tr. 22).  It is possible that the ALJ rejected the remainder of Dr. Moore's opinions because he determined the opinions were *not* generally supported by the long-term record.  The ALJ, however, did not provide such a reason, and it is not the Court's place to justify the ALJ's decision *post hoc*.  See Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).

that the Magistrate Judge erroneously required the ALJ to accord special deference to Dr. Moore's opinions.

In evaluating medical opinions, the ALJ is directed to consider many factors, including the examining relationship, the treatment relationship, whether an opinion is amply supported, whether an opinion is consistent with the record, and a doctor's specialization.  Poellnitz v. Astrue, 349 F. App'x 500, 502 (11th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)).  Generally, the opinions of examining or treating physicians are given more weight than non-examining or non-treating physicians unless "good cause" is shown.  Id. (citing 20 C.F.R. § 404.1527(d)(1), (2), (5); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).

The weight to be given a non-examining physician's opinion depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence.  Id. (citing 20 C.F.R. § 404.1527(d)(3)–(4); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158, 1160 (11th Cir.2004)).  Generally, the more consistent a physician's opinion is with the record as a whole, the more weight an ALJ will place on that opinion.  Id. (citing 20 C.F.R. § 404.1527(d)(4)).  Thus, the opinion of a non-examining physician is entitled to little weight when it contradicts the opinion of an examining physician.  Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir.1988); see also Sharfarz v. Bowen, 825

F.2d 278, 280 (11th Cir. 1987) ("The opinions of nonexamining, reviewing physicians, . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence.").

The Magistrate Judge noted that "the ALJ actually gave the state agency consultants' opinions full weight, as the ALJ adopted those exact limitations in his RFC determination, finding that Plaintiff could perform simple tasks in low stress jobs with only occasional contact with the general public and coworkers."  (R&R at 23).  She found that "the only opinions that indicated that Plaintiff could meet the mental RFC requirements to perform medium work were those of the non-examining state agency consultants.  Their opinions were entitled to little weight, however, and cannot serve as substantial evidence."  (Id. at 24 (citing Sharfarz, 825 F.2d at 280)).

The Commissioner argues that "Eleventh Circuit law shows no requirement for an ALJ to accord special deference to the opinion of a one-time CE examiner because the physician and patient do not share a longitudinal or treatment relationship, as contemplated by the regulations."  (Obj. at 5-6).  First, Eleventh Circuit precedent and the Commissioner's own regulations provide that examining physicians generally receive more weight than non-examining physicians.  See, e.g., 20 C.F.R. § 416.927(c)(1); Lewis, 125 F.3d at 1440.  Second, while the ALJ

was not required to afford Dr. Moore's opinion "special deference," his decision to give "no weight" to portions of Dr. Moore's opinion was required to be clearly articulated and supported by evidence.  See Syrock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (ALJ may reject the opinion of any physician if the evidence supports a contrary conclusion).  Third, the Commissioner's argument misunderstands the R&R.  The Magistrate Judge did not require the ALJ to "accord special deference" to Dr. Moore's and Dr. Ojelade's opinions.  Rather, she observed that the non-examining consultants' opinions regarding Plaintiff's medium work requirement—standing alone and contradicting Dr. Moore's and Dr. Ojelade's opinions—do not constitute substantial evidence to support the ALJ's decision.  The Court generally agrees non-examining consultants' opinions are not alone sufficient to contradict an examining physician's opinion.  See Sharfarz, 825 F.2d at 280.  The Court, however, declines to opine on the non-examining consultants' opinions until the ALJ clarifies his evaluation of Dr. Moore's opinion in the ALJ's order.

    D.    <u>Weight ALJ Gave to Non-Examining State Agency Consultant Opinions</u>

The Commissioner next objects to the Magistrate Judge's finding that the ALJ gave more weight to the non-examining consultants' opinions than to Dr. Moore's and Dr. Ojelade's opinions.  The analysis of this argument largely

overlaps with the discussion above.  The Commissioner argues that the R&R

erroneously relies on Sharfarz, among other cases, "for the proposition that a

non-examining physician's opinion can never be given substantial weight."  (Obj.

at 8).  Sharfarz and its progeny require that "[t]he opinions of nonexamining,

reviewing physicians, . . . when contrary to those of the examining physicians, are

entitled to little weight, and standing alone do not constitute substantial evidence."

Sharfarz, 825 F.2d at 280.  As explained above, the Magistrate Judge found that

"the only opinions that indicated that Plaintiff could meet the mental RFC

requirements to perform medium work were those of the non-examining state

agency consultants."  (R&R at 13).  These opinions, the Magistrate Judge

determined, were "contrary to those of the examining physicians," Drs. Moore and

Ojelade, and thus "are entitled to little weight."  Sharfarz, 825 F.2d at 280.

The Commissioner argues that the "regulations governing the evaluation of

medical sources and state agency physicians" changed after Sharfarz "to clarify

that opinions of non-examining sources may override opinions from treating or

examining sources, provided evidence in the record supports the non-examining

source's opinion."  (Obj. at 8-9).  Again, Sharfarz stands for the general

proposition that opinions of non-examining, non-reviewing physicians, are entitled

to little weight when contrary to those of an examining physician, and, taken alone,

27

they do not constitute substantial evidence.  See Fleming v. Comm'r Soc. Sec., 550 F. App'x 738, 739-40 (11th Cir. 2013).  The regulations the Commissioner relies on are in accord with Sharfarz.  See 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to opinions from . . . treating sources . . . .").[4]  The Court, however, declines to address the weight given to non-examining consultants' opinions until the ALJ provides the clarification regarding his treatment of Dr. Moore's opinion, as required by this Order.

E.      Step Five

The Commissioner next argues that the Magistrate Judge erred in requiring the ALJ's RFC to "describe limitations that demonstrate a specific connection to a medical opinion."  (Obj. at 10).  The Commissioner argues that "the Commissioner's regulations place the final responsibility for determining a claimant's RFC with the ALJ based upon all the evidence in the record, not just the

---

[4]      Indeed, Courts in the Eleventh Circuit consistently apply Sharfarz and its progeny.  See, e.g., Fleming, 550 F. App'x at 739-40; Hickel v. Comm'r of Soc. Sec., 539 F. App'x 980, 986 (11th Cir. 2013); Rosario v. Comm'r of Soc. Sec., 877 F. Supp. 2d 1254, 1266 (M.D. Fla. 2012); Burroughs v. Massanari, 156 F. Supp. 2d 1350, 1365 (N.D. Ga. 2001)

relevant medical evidence." (Id.).  The Court declines to address this objection

until the ALJ provides the clarification regarding his treatment of Dr. Moore's

opinion, as required by this Order.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Commissioner's Objections to the

R&R [17] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Catherine M.

Salinas's Final Report and Recommendation [13] is **ADOPTED AS MODIFIED**.

**IT IS FURTHER ORDERED** that the decision of the Commissioner is

**VACATED** and this matter is **REMANDED** pursuant to sentence four of 42

U.S.C. § 405(g).  On remand, the ALJ is required to state with specificity his

reasons for rejecting or accepting Dr. Moore's opinions, to clarify his statement

that Dr. Moore "wrote" that she largely relied on Plaintiff's statements, and to

further develop the record regarding the extent of Plaintiff's mental impairment(s),

if any, and their effects on her ability to do basic work activities.

**SO ORDERED** this 26th day of July, 2016.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE